JERECKI MANUFACTURING CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 10798.   Promulgated July 5, 1928.

*Frank J. Maguire, Esq.*, and *Edw. N. Mills, Esq.*, for the petitioner.

*J. Arthur Adams, Esq.*, for the respondent.

OPINION.

MILLIKEN: Briefly stated, three questions are presented, which are: (1) whether petitioner is entitled to deduct from its gross income for 1917 the amount of the overdraft of its employee, Weart; (2) what was the cost of petitioner's fixed assets at Erie for the purpose of computing invested capital; and (3) what was the fair market value of such assets on March 1, 1913, for the purpose of computing depreciation.

The first question is controlled by sections 12 (a) and 13 (d) of the Revenue Act of 1916. Section 12 (a) provides for the deduction from gross income of a corporation of:

All the ordinary and necessary expenses paid within the year in the maintenance and operation of its business and properties * * *.

Section 13 (d) reads:

(d) A corporation, joint-stock company or association, or insurance company, keeping accounts upon any basis other than that of actual receipts and disbursements, unless such other basis does not clearly reflect its income, may, subject to regulations made by the Commissioner of Internal Revenue, with the approval of the Secretary of the Treasury, make its return upon the basis upon which its accounts are kept, in which case the tax shall be computed upon its income as so returned;

Under the facts presented by the record petitioner could not have accrued in 1916 this overdraft as a liability, for the reason that the overdraft was not then a liability but an asset. Petitioner was under no obligation to pay Weart this amount. On the contrary, he owed it to petitioner. He continued to owe it until he was released and the amount credited to his account. This occurred in 1917 and the sole issue presented is whether the amount released constituted an ordinary and necessary business expense for the year 1917. The cancellation of the account was not in the nature of a gratuity. It was based upon a valuable consideration and that consideration was that petitioner retained the services of its valuable employee. In the judgment of petitioner's officers it was a good business proposition to pay this amount rather than lose its employee's services. If we had the right, we would hesitate to substitute our judgment for that of those who were fully cognizant of the needs of the company and presumably able to determine what was best for it. We have not here the question that arises under the Revenue Act of 1918 and subsequent revenue acts—whether the salary was "reasonable." There is no such provision in the Revenue Act of 1916. In *United States* v. *Philadelphia Knitting Mills Co.*, 273 Fed. 657, the Circuit Court of Appeals for the Third Circuit had before it the question of the allowance as a deduction of salaries of corporate officers who were also directors and stockholders under the provisions of the Corporation Excise Tax Act of 1909, which contained a provision similar to section 12 (a) of the Revenue Act of 1916. There the court said:

Whether services were rendered and whether also they were commensurate with the salary paid are matters of judgment and discretion reposed by general law in the board of directors of the corporation. As the board of directors is charged with the duty and clothed with the discretion of fixing the salaries of the corporation's officers, the Government has no right (until expressly granted by statute) to inquire into and determine whether the amounts thereof are proper, that is, whether they are too much or too little. But, while the amount of salary fixed by a board of directors is presumptively valid, it is not conclu-

sively so, because the Government may inquire whether the amount paid is salary or something else. Admittedly the Government has a right to collect taxes on net income of a corporation based on profits after all ordinary and necessary expenses, including salaries, are paid. It has a right, therefore to attack the action of a board of directors and show by evidence, not that a given salary is too much, but that, in the circumstances, the whole or some part of it is not salary at all but is profits diverted to a stockholding officer under the guise of salary and as such is subject to taxation.

The Court of Claims in *Gray & Co.* v. *United States*, decided June 6, 1927, quoted from the above opinion and applied it to section 12(a) of the Revenue Act of 1916.

Weart was not a stockholder and received nothing in the nature of a distribution of profits. Under these circumstances we are satisfied that the release of Weart from his debt to the company in 1917 constituted a proper and necessary business expense of the corporation for that year, and it is therefore deductible in that year from gross income.

With respect to the second and third issues, it was stated by petitioner's counsel at the hearing that all that was submitted for decision was the respective bases for the computation of invested capital and depreciation. The question of proper rates for depreciation was not presented.

In computing invested capital, respondent accepted, subject to certain adjustments, the capital and surplus shown by petitioner's books. In computing depreciation, he also relied upon the books. He made no determination of value as of March 1, 1913. Petitioner insists and we in effect have found that these books were wholly unreliable for either of these purposes. Cf. *Union Metal Manufacturing Co.* 1 B. T. A. 395; *Rockford Brick & Tile Co.*, 4 B. T. A. 313; and *Donaldson Iron Co.*, 9 B. T. A. 1081. Many of petitioner's records were lost in the flood of 1915. Such as were left could be read only by the use of a microscope. The books, such as they were, did not disclose the existence of a large part of petitioner's machinery and equipment. Often such cost as was shown was not the whole cost. There was no cost account on the books. Capital items were often charged to expense. There is nothing peculiar in this when we remember that this was purely a family affair. The business was begun by two brothers in 1852, and at the date of the hearing 92 per cent of its outstanding stock was held by their respectively families. The strict method of accounting which prevails in those corporations whose stock is held by persons who have no tie except corporate success is not to be expected of corporations whose stock is held by close kindred. So it was here. Neither could these people, prior to the adoption of the Sixteenth Amendment, have foretold that March 1, 1913, would be the most important date in the history of

their corporation, nor that the peculiar statutory concept of invested capital would become an important element in its taxation.

Our findings as to the unreliability of the books are amply borne out by the testimony adduced at the hearing. Petitioner's president testified that he showed the revenue agent, whose report is the foundation of respondent's findings, three large machine tools valued at $15,000 or $20,000 apiece, which did not appear upon the books. The representative of the appraisal company testified that he and his associates made a complete search of the books and that wherever they found cost they used it; that often the cost found was only a partial cost and that time and time again they could not find any cost whatever for machines in actual existence and active use when the appraisal was made. Respondent's counsel subjected this witness to a most searching cross-examination and brought out that the cost of machine after machine could not be found in the books. The reason for this became apparent when it was developed that approximately two-thirds of the assets appraised were acquired prior to 1902 and that there was but little change between 1897 and 1902. The record discloses that the books of the company upon which respondent relied furnished an wholly inadequate basis for his determinations.

The only evidence we have before us on the question of cost is the report of the appraisal company and the testimony of its employees who made the appraisal. The first and most important fact that was developed was that every building, every machine and every piece of equipment that were appraised as of the year 1920 were in actual existence and in operation in that year. The appraisers had the benefit of the appraisal made in 1902. They deducted as abandoned assets at the Ninth Street Plant items, the total cost of which was $27,730, and at the Twelfth Street Plant items costing in all $2,958.94. The total cost of all items deducted which were acquired subsequent to 1902 was $415. All the remainder were acquired prior to that year. When we consider that the appraisers had the benefit of the 1902 appraisal, the fact that the assets appraised for the year 1920 were then in actual existence and operation, the checking of one appraisal against the other, and the care used by the appraisers to determine the date of acquisition of each item, we are convinced that the assets appraised as being in existence on March 1, 1913, and at the beginning of each year involved in this proceeding were in existence on those dates. Against these facts we have only respondent's determination which is based on the books of the corporation, which in turn were unreliable on this point. We accept the facts as to the existence of the assets appraised on the various dates as against the respondent's determination based on mutilated and unreliable books.

We next take up the question of the cost of these assets. Again it appears that the books can not be relied upon. We know that about two-thirds of these properties were acquired at times when the bookkeeping was quite defective and before the flood destroyed a part of petitioner's records. We know that machines of large value which were in actual operation in 1920 did not appear on the books. We must assume that machines of large value represent something in cost. As to what this cost was we have before us only the evidence and must be guided thereby. Here again we have only the evidence introduced by petitioner. That evidence consists of the appraisal and the testimony of those who compiled it. These witnesses testified that whenever cost was found on the books it was used. Where it could not be found the price of similar items on the date of acquisition was used. When a machine or piece of equipment was manufactured by petitioner, its cost was determined by the cost of the material, the cost of the labor and by adding an applicable proportion of the overhead expense. This overhead did not include interest, taxes, and similar carrying charges. If proper amounts were used in making such computation, the result arrived at would be the true cost. What constituted all the carrying charges which were attributed to each machine does not appear except as above stated. What these overhead charges consisted of could have been developed upon cross-examination, but they were not. It may also be true that the appraisers did not possess complete information as to the time necessary to complete a certain machine or the exact cost of the labor employed therein. If so, this also could have been but was not brought out upon cross-examination.

We have before us no evidence impeaching the cost set out in the appraisal and supported by the testimony of petitioner's witnesses. The whole appraisal, consisting of eight volumes, was introduced in evidence. Therein is recorded each item, its date of acquisition and its cost. Such an appraisal so meticulously and carefully made by expert and competent appraisers should not be discarded by raising a doubt here or a doubt there, especially since respondent has not attempted to supply the cost of items actually in existence, the cost of which does not appear on the books. Cf. *Donaldson Iron Co.*, *supra*. We have set forth in our findings of fact the method used by the appraisers in determining the depreciated cost of petitioner's fixed assets as of March 1, 1913, and this method meets all proper requirements. Cf. *Paducah Water Co.*, 5 B. T. A. 1067. After careful consideration of all the evidence, we are of opinion that costs of petitioner's fixed assets are the amounts set forth in the findings of fact and that the basis for computing its surplus is the depreciated cost of such assets. These costs should be adjusted for the years

involved by a proper depreciation and by all additions and deductions, also properly depreciated.

The remaining question is, What was the fair market value of petitioner's assets at Erie on March 1, 1913, for the purpose of depreciation? The only evidence we have on this issue is the testimony of petitioner's president to the effect that in his opinion all petitioner's fixed assets at Erie, including real estate, on said date, had a fair market value of about $1,500,000, and the testimony of a representative of the appraisal company that the same assets had a fair market value of $1,170,610.53. Petitioner's president did not refer to nor does he appear to have had information relative to actual sales of similar plants. He testified solely from his knowledge of his own plant and of the industry in general. It is true he has had large experience in his business and has a general knowledge of the method in which similar concerns conduct their affairs. We regard his testimony more in the nature of a guess or rather an estimate of what amount petitioner was then willing to take for the plant. There is no testimony as to what a willing buyer might have offered. The testimony of an official of the appraisal company is based solely on the estimate made by his company of the depreciated reproduction cost of the assets as of March 1, 1913. He was not at the plant when the appraisal was made and there is nothing in the record to show that he was there either after or before that time.

Petitioner insists that depreciated reproduction cost represents true market value and in support of this contention refers to *McCardle* v. *Indianapolis Water Co.*, 272 U. S. 400. The water company involved in that case was a public service corporation, which had no competitors and which was not restricted in its charges by governmental regulation. Every such corporation, unless restricted by a valid contract, is entitled to a reasonable return upon its investment, a right guaranteed by the Fourteenth Amendment. Without discussing the question whether such a method of determining the value of properties of such public service corporations is or is not a proper or exclusive method, we point out that petitioner does not have the exclusive rights of such a corporation but is subject to competition. It is dependent upon the good will and needs of the purchasing public and the quality of and demand for its products. The real question presented in this proceeding is what would a willing buyer have given and what would a willing seller have accepted for these assets as a part of a going concern on March 1, 1913.

In the absence of other proof, true market value depends largely upon earning capacity. As concerns the earning capacity of petitioner, the only evidence is that introduced by respondent and that was the introduction of petitioner's returns for the years 1910, 1911, 1912, 1913, and 1917. In its returns for 1910, 1911, and 1912, peti-

tioner reported as net income for those years respectively, $344,598.95, $290,721.21, and $383,167.58. For the year 1913 petitioner made an original and an amended return. In the original return it reported as net income the amount of $189,242 and in the amended return it reported $262,783. Respondent also read in the evidence the statement of the revenue agent made in his report that petitioner's capital, surplus and undivided profits at the end of the year 1909 amounted to $4,507,492.04 and that part of its return for 1917 where petitioner reported its capital, surplus and undivided profits as of the end of the years 1910, 1911, and 1912 in the respective amounts of $4,600,232.77, $4,640,953.98, and $4,824,121.56. On the basis of the report and the returns, the percentages of net income to capital were as follows:

|  | Per cent |
|---|---|
| 1910 | 8.08 |
| 1911 | 6.3 |
| 1912 | 8.4 |
| 1913 | 5.42 |

The average percentage for the four years 1910 to 1913, inclusive, was 6.66 per cent. If we eliminate 1913, during which year it was testified there was a strike, and also for the reason that five-sixths of the year elapsed after March 1, 1913, the average for the years 1910 to 1912, inclusive, was 7.2 per cent. These returns were made on a cash receipts and disbursements basis, while it appears that petitioner was on an accrual basis and for this reason possibly may not truly reflect net income. Besides, we do not know what adjustments the Commissioner may have made. Under these circumstances, we can not say that we know what was the precise amount of net income, nor of capital, surplus and undivided profits for any of these years. Petitioner asks us to accept as fair market value the cost of its property determined upon the basis of reproduction as of March 1, 1913, properly depreciated. Whatever may be the merit of this method in determining value of properties of public service monopolies, we are of opinion that on the facts presented in this proceeding, such value would be in excess of fair market value as above defined. The only other evidence before us [respondent has found no March 1, 1913, value] is the cost of the various properties. These costs depreciated as of March 1, 1913, more nearly approach what we believe to be fair market value than reproduction cost. On the evidence before us we are of opinion that the actual cost of the assets, depreciated as found, represents their fair market value as of March 1, 1913, for depreciation purposes. Of course, the cost of the land should be eliminated since that is not a depreciable asset.

*Judgment will be entered under Rule 50.*