Philadelphia Steel & Iron Corporation v. Commissioner.
Philadelphia Steel & Iron Corp. v. Commissioner
Docket No. 91893.
United States Tax Court
T.C. Memo 1964-93; 1964 Tax Ct. Memo LEXIS 241; 23 T.C.M. (CCH) 558; T.C.M. (RIA) 64093; April 13, 1964
*241 1. Petitioner purchased, under a written Agreement of Sale, dated January 23, 1956, certain assets, including all machinery and equipment, and business of the Philadelphia Steel and Iron Company, effective as of January 1, 1956. Petitioner paid $472,232.46 for the assets in controversy. Under the Agreement of Sale $1.00 was designated for good will and the balance to depreciable property. Held: Of the total amount of $472,232.46 paid by petitioner for the purchase of the assets, both tangible and intangible, of the Philadelphia Steel and Iron Company, the sum of $294,967.76 represented the cost to petitioner of machinery and equipment for depreciation purposes and $177,264.70 represented the cost of intangible assets including good will. 2. During the taxable year ending March 31, 1957, petitioner sold certain of the aforesaid machinery and equipment and also an automobile which had been acquired after January 1, 1956. Using the cost basis of $472,232.46 as the cost basis of all of the machinery and equipment in question, petitioner made allocations to the above sold items, and claimed an ordinary business loss of $7,422.56, with respect to the taxable year ending March 31, 1957. *242 Respondent adjusted this claimed loss, using as the cost basis of the machinery and equipment in question the amount of $143,654. Held: In determining the gain or loss incurred by petitioner on the sale of the aforesaid machinery and equipment the amount of $294,967.76 will be used as the cost basis of the entire machinery and equipment purchased by petitioner as of January 1, 1956. Charles S. Jacobs and Donald D. Kennedy, Jr., for the petitioner. Max J. Hamburger, for the respondent. FISHER
Memorandum Findings of Fact and Opinion FISHER, Judge: Respondent determined deficiencies in income tax of petitioner in *243 the amounts and for the fiscal years set forth below: Fiscal Year Ending
Deficiency
March 31, 1956
$ 5,023.34
March 31, 1957
21,239.32
March 31, 1958
19,272.65
March 31, 1959
15,695.34
The issues presented for our consideration are: (1) Whether respondent properly allocated cost basis as between the tangible and intangible assets here involved, and if not, what is the proper allocation of such basis; and (2) whether the sale by petitioner of certain machinery purchased by said petitioner as a part of the transaction referred to in issue (1) (as of January 1, 1956), and an automobile purchased thereafter, which were sold during the taxable year ended March 31, 1957, resulted in an ordinary business loss of $7,422.56 and contended by petitioner, or a short-term capital gain of $445.85, and a long-term capital gain of $455.91, as determined by respondent, or otherwise. Petitioner, on brief, conceded that respondent did not err in disallowing a deduction for increased Pennsylvania Corporate Net Income Tax liability incurred as the result of adjustments made by respondent with respect to which petitioner has not petitioned for redetermination and which increased *244 its taxable income. Findings of Fact The facts are partly stipulated and, to the extent so stipulated, are incorporated herein by reference. Philadelphia Steel & Iron Corporation, hereinafter sometimes referred to as petitioner, is a Delaware corporation with its principal office at Conshohocken, Pennsylvania. Its tax returns were filed with the district director of internal revenue, Philadelphia, Pennsylvania. Petitioner keeps its books and records and files its tax returns on the accrual basis of accounting and by fiscal years ending March 31st. Philadelphia Steel & Iron Corporation is the successor by purchase of the assets and business of a solely owned proprietorship, Philadelphia Steel and Iron Company (hereinafter sometimes referred to as Proprietorship) as of January 1, 1956. Petitioner's predecessor commenced operations as a partnership in 1918 with its place of business at Conshohocken, Pennsylvania, the partners being John J. Regan and Wilmer C. Swartley. The business continued in operation as a partnership until the death of Swartley on January 23, 1950. Regan acquired the 50 percent interest of his deceased partner by purchase about February 21, 1950, and, *245 thereafter, continued to operate the business as a sole proprietorship until his death on November 20, 1954. Regan died testate leaving a surviving wife, Grace Regan. Grace Regan and Girard Trust Corn Exchange Bank (hereinafter sometimes referred to as Girard) were the executors of the estate and continued to operate the business until January 1, 1956. Under the will they were empowered, in their discretion, to operate the Proprietorship, then in the business of steel and iron forging, for whatever period of time they determined and to sell the same when they desired. G. O'Dell Fletcher, senior investment officer of Girard, familiarized himself with the operation of the Proprietorship after the bank had qualified as executor. Within a few months after the executors had qualified, Girard, through Fletcher, advised Grace Regan to sell the company because of his view that said business would become less profitable due to the loss of the strong leadership of her husband, John T. Regan. The bulk of the products sold by the Proprietorship and later by petitioner are pipe flanges used in pipelines, oil refineries and chemical plants. The business was at all times faced with strong competition *246 from other manufacturers in the United States and in foreign countries who fabricate exactly the same type of pipe flanges to the same American Standard Association specifications and sell to the same customers. The Proprietorship held no patents, trade-marks or exclusive selling rights. In the fall of 1955 G. Joseph Keady, president and major stockholder of petitioner, learned that the Proprietorship was being offered for sale. Keady, because of his background and experience, is qualified to appraise heavy manufacturing equipment. He physically inspected the Proprietorship's plant and concluded that the equipment as mounted, wired, and piped for steam, was worth between $900,000 and $1,000,000. Thereafter Keady asked his friend, Frederick W. Stackelbeck, who was an engineer and also experienced in appraisals of manufacturing equipment, to physically inspect the machinery and equipment and appraise its value. Stackelbeck appraised the value of machinery and equipment at not less than $1,000,000. At the time Stackelbeck made his appraisal he had no knowledge of the value at which Keady appraised the machinery and equipment. Prior to petitioner's purchase of the Proprietorship's *247 business, Keady retained the Keystone Appraisal Company of Philadelphia, Pennsylvania, (hereinafter sometimes referred to as Keystone) to appraise the value of the Proprietorship's machinery and equipment. Keystone determined that the depreciated or sound value of the machinery and equipment was $920,968.03 on January 17, 1956. In arriving at this basis, Keystone used replacement cost of machinery of the same or similar type which it then adjusted by depreciation. Information relative to current replacement costs was obtained from standard published literature and/or quotations from companies by whom the machinery and equipment was manufactured. The depreciation factors were determined after a physical inspection by appraisal engineers employed by Keystone. The amount determined by Keystone to be the replacement value of the machinery and equipment was $1,553,706.25. The amount of adjustment determined for depreciation was $632,738.22. The resultant depreciated or sound value was taken at $920,968.03. In arriving at this valuation, it was assumed that the machinery and equipment would be continued in normal use in the same location as at the time of appraisal by an operating manufacturer. *248 Negotiations during the period from December 1955 to January 1956 between Keady and Fletcher resulted in the petitioner's purchase, under a written Agreement of Sale dated January 23, 1956, of certain of the assets, including all machinery and equipment of the proprietorship, the agreement being effective as of January 1, 1956. Petitioner did not purchase the land, buildings, or railway siding owned by the predecessor company. Petitioner under a written lease agreement dated January 23, 1956, leased the land and buildings of the Proprietorship for a term of ten years commencing on January 3, 1956. Under the lease, petitioner was granted an option to purchase the leased property, such option being exercisable after January 1, 1961. Said option was, in fact, exercised in January 1961. The Agreement of Sale dated January 23, 1956, which was negotiated at arm's-length, provides, in part, as follows: Sellers, for and in consideration of the undertakings herein mentioned, * * * have granted, bargained, sold and delivered and by these presents do grant, bargain, sell and deliver unto the Purchaser, its successors and assigns, all and singular property and assets, of whatsoever kind *249 and character and wheresoever situate, of the Company, including without limitation the cash, advances, inventory, machinery, equipment, tools, dies, patterns, furniture, fixtures, motor vehicles, the good will, the name Philadelphia Steel & Iron Company, the business, the books of account, records, insurance policies except those on buildings, accounts and notes receivable, bank accounts, except payroll withholding accounts, inclusive of all property reflected in Exhibit A (exclusive however of land, buildings and railroad siding) * * * The Agreement further provided: * * *
2. The purchase price was determined by the parties on the basis of Exhibit A annexed hereto: (a) For all inventories of finished goods, work in process and raw materials, $213,427.19. (b) For cash, accounts receivable, notes receivable, if any prepaid insurance, advances, prepaid and deferred items $402,539.23. (c) For good will, the name of the Company and business $1.00. (d) For all of the assets and property of Company, both tangible and intangible and wheresoever located (except and excluding all land owned by Company and all buildings owned by Company, and railroad siding owned by Company, *250 and except and excluding the assets described in (a), (b), and (c) of this subparagraph 2 $473,546.65. * * *
The book value of the fixed assets acquired by the petitioner as said assets appeared on the books of its predecessor as of November 30, 1955, (without adjustment for the value of such assets as of the date of death of John J. Regan) is as follows: Buildings
$ 48,779.74
Railroad siding
2,108.58
Equipment
220,116.72
Furniture & Fixtures
11,273.26
Automobiles
6,423.05
Total
$288,701.35
Less: Depreciation
224,141.76
Net book value
64,559.59
Less: Book value of buildings
& RR siding
15,707.32
Book value of assets pur-
chased by petitioner
$ 48,852.27
Of the total consideration paid by petitioner for the assets acquired by it from the predecessor company pursuant to the Agreement, the amount allocable to cash, accounts receivable, inventory and certain deferred items is not in dispute. The net sales, gross profit, net operating profit, and the percentage relationship of net profit to net sales of the Proprietorship for the taxable years 1951 to 1955, inclusive, are as follows: Percentage
Net
Relation
Taxable
Operating
of Net Profit
Year
Net Sales
Gross Profit
Profit
to Net Sales
1951
$1,515,051
$1,080,053
$414,868
27.4
1952
1,389,606
1,040,154
347,653
25.0
1953
1,302,501
921,917
218,325
16.8
1-1-54 - 11-20-54 *
1,478,583
1,065,528
320,131
21.6
11-20-54 - 12-31-54
136,991
93,252
18,392
13.4
1955
1,687,632
1,158,445
354,502
21.0
*251 These computations are for a sole proprietorship which was not required to lease real estate in which to operate. The net operating profits as computed for the Proprietorship are, therefore, without deduction for proprietor's salary, corporate taxes or rental payment for real estate. The names and the amount of sales to certain of the more substantial customers of the petitioner's predecessor company, Philadelphia Steel and Iron Company, for the year 1955 (being the year when the business was operated by the executors of John J. Regan, Deceased, former owner) and for the year 1956, when the petitioner was in operation of the business are as follows: Amount
of Sales
Name of Customer
1955
1956
Bethlehem Steel Co.
$ 74,000
$103,000
Esso Standard
382,000
352,000
J. H. Frischkorn
65,000
118,000
Charles S. James Co.
50,000
67,000
Keddy Manufacturing Co.
45,000
31,000
Moorlane Co.
85,000
113,000
O-T-M Corporation
128,000
262,000
Phoenix Manufacturing Co.
104,000
158,000
Pittsburgh Piping Co.
56,000
73,000
Sun Shipbuilding Co.
41,000
48,000
Texaco Inc.
157,000
129,000
Waldron-Hartig
101,000
221,000
Waterman Machinery Co.
201,000
210,000
West Penn Power
24,000
9,000
Whitehall Cement Co.
8,000
10,000
*252 The Proprietorship had been dominated to some extent by Regan. He did not delegate complete authority or responsibility to a production department, sales department or administrative department. The organization was directly responsible to Regan personally. After the purchase of the proprietorship, Keady considered it necessary to reorganize the business so that it could operate efficiently through several autonomous, decentralized department heads. To this end, he retained the organization to function with full responsibility in the various departments. The amount of $473,547.65, representing the total amount for the items included in (c) and (d) of subparagraph 2 of the Agreement set forth above, was subsequently adjusted to $472,232.46 by the parties. On its books of account and for Federal income tax purposes, the petitioner recorded the full purchase price of $472,232.46 as the original unadjusted cost basis of the machinery and equipment purchased from its predecessor for purposes of determining allowable depreciation and gain or loss on the sale or exchange thereof. Petitioner on its books of account did not record as the original cost paid for good will the sum of $1.00 *253 stated in the Agreement or any other amount. In his notice of deficiency respondent determined that of the $472,232.46 purchase price paid by the petitioner, the sum of $143,654 represented the cost of machinery and equipment purchased and the balance of $328,578.46 represented the cost of good will, going concern and other intangible values. The aforesaid cost basis, as determined by the respondent, was predicated on valuation of the machinery and equipment in question by a valuation engineer in the employ of respondent who made a determination purporting to show what such property would sell for on the open market to a willing buyer for use in another location and not as part of the sale of a going business for use in the same location. In arriving at the amount of $143,654, respondent excluded from the valuation certain items which petitioner had included. In its valuation of machinery and equipment to determine its depreciated or sound value, Keystone (employed by petitioner) included the valuation of electric wiring, foundations, boiler equipment, brick furnaces, overhead piping and yard tanks. The machinery and equipment purchased by the petitioner as of January 1, 1956, had *254 a useful life of 10 years and was subject to an annual depreciation rate of 10 percent. The petitioner's depreciation deductions for the years in question were based, in part, on items of electric wiring, foundations, brick furnaces, overhead piping and yard tanks. In its Federal income tax returns for the taxable years ended March 31, 1956, through 1959, inclusive, and based on said unadjusted basis of $472,232.46, the petitioner claimed depreciation deductions in the amounts of $11,805.81, $46,947.80, $45,874.98 and $45,869.90, respectively. Respondent, based on his downward adjustment of basis for the machinery and equipment, partially disallowed the deductions for depreciation claimed by petitioner, such disallowances being in the amounts of $8,214.46, $32,665.63, $31,916.19 and $31,911.11 for the taxable years ending March 31, 1956, through 1959, respectively. Certain items of the machinery and equipment purchased by the petitioner as of January 1, 1956, were sold during 1956 and 1957, prior to the end of the petitioner's March 31, 1957, fiscal year, as a result of which petitioner claimed an ordinary loss of $7,422.56 based on an unadjusted basis of $472.232.46 for all machinery *255 and equipment purchased. On the basis of the respondent's determination that the cost basis of the entire machinery and equipment in question was $143,654 and the allocation of this cost to the sale of the aforesaid machinery, respondent determined that petitioner had realized a shortterm capital gain of $445.85, and a long-term capital gain of $455.91. The depreciable assets purchased by petitioner as of January 1, 1956, had a cost basis of $294,967.76 and intangible assets had a cost basis of $177,264.70. Opinion Issue I. Cost Basis for Depreciation Respondent determined that the cost basis of the machinery and equipment acquired by the petitioner as of January 1, 1956, from its predecessor company, Philadelphia Steel and Iron Company, for the purpose of determining petitioner's depreciation allowance under section 167(a)(1)(g)[1] and section 1012[2] of the 1954 Code with respect to said property was $143,654 and not $472,231.46 as claimed by petitioner. Essentially, it is respondent's position that petitioner paid $143,654 for the machinery and equipment and $328,578.46 for the good will, going concern value and other intangible values of the predecessor company. Petitioner, *256 in opposition, contends that it paid nothing for the good will of its predecessor company except the nominal amount of $1.00 specified in the Agreement of Sale, and, hence, the unadjusted basis for Federal income tax purposes of said machinery and equipment was $472,231.46. *257 Respondent's determination is presumed to be correct and the burden of proof is upon petitioner to establish error in such determination. See Estate of Robert R. Gannon, 21 T.C. 1073, 1083 (1954). The form in which a taxpayer chooses to clothe its transactions does not, of course, bind the respondent for tax purposes. The respondent is free to examine the underlying facts and treat the transaction, taxwise, in accordance with such facts whether or not they comply with the form selected. Recitations of a written instrument as to the allocation of the consideration are not necessarily conclusive and it is always competent to show by parol or other extrinsic evidence what the real consideration was. As was stated by the Supreme Court in Commissioner v. Court Holding Co., 324 U.S. 331 (1945): To permit the true nature of a transaction to be disguised by mere formalisms, which exist solely to alter tax liabilities, would seriously impair the effective administration of the tax policies of Congress. * * *
Likewise, *258 in Hamlin's Trust v. Commissioner 209 F. 2d 761 (C.A. 10, 1954), affirming 19 T.C. 718 (1953), the Tenth Circuit said at p. 764: It is well settled that the incidence of taxation depends upon the substance of a transaction; that tax consequences which arise from gains from a sale of property are not finally to be determined solely by the means employed to transfer legal title; and that the Government may look at the realities of a transaction and determine its tax consequences despite the form or fiction with which it was clothed. * * * To the same effect see Copperhead Coal Co., Inc. v. Commissioner, 272 F. 2d 45 (C.A. 6, 1959), affirming a Memorandum Opinion of this Court; Gooding Amusement Co., Inc., 23 T.C. 408, 418 (1954), affd. 236 F. 2d 159 (C.A. 6, 1956), certiorari denied 352 U.S. 1031 (1957). For reasons hereinafter discussed, we believe that the recitals in the aforesaid sales agreement anent the cost of the tangible assets and good will purchased by petitioner do not accurately reflect the *259 true facts or proper allocation of the consideration in the transaction involved herein. Where the issue is to determine the cost basis of an aggregate of assets, including both depreciable and nondepreciable items, it is essential to ascertain the fair market value of the items which are subject to depreciation. As used in this context, "fair market value" has been defined as the price at which property would change hands in a transaction between a willing buyer and a willing seller, neither being under compulsion to buy nor sell and both being reasonaby informed as to all relevant facts. O'Malley v. Ames, 197 F. 2d 256-257 (C.A. 8, 1952); Singer v. Shaughnessy, 198 F. 2d 178 (C.A. 2, 1952). The value of machinery and equipment at a particular time is a question of fact which must be proved by competent evidence. The Kinsman Transit Co., 1 B.T.A. 552, 554 (1925). In an effort to establish the fair market value of the machinery and equipment involved herein, *260 petitioner has adduced evidence to show the replacement cost (sometimes referred to as reproduction cost) of the property less accrued depreciation. In essence, the record shows that petitioner specifically requested the Keystone Appraisal Company to make its evaluation of the machinery and equipment in question on the basis of replacement cost as of January 1, 1956. Keystone engineers determined the reproduction costs of the assets to be $1,553,706.25 and that the depreciated or sound value of said property at the time of purchase was $920,968.03, computed on the basis of prices for comparable new machinery and equipment. At the time petitioner purchased the machinery and equipment in question, a substantial portion thereof was 25 to 30 years old and some of it was fully depreciated. For example, a Chambersburg steam hammer which was built prior to 1921 and cost $2,500 at that time was fully depreciated at the date it was acquired by petitioner. Said hammer was appraised, however, by Keystone on the basis of replacement value, in the amount of $35,000. Since the appraisers retained by petitioner were requested to make a "going concern appraisal" of the machinery and equipment in *261 petitioner's plant, and not a fair market valuation, the resultant valuation was of a hypothetical new plant, less depreciation. While such evidence is undoubtedly a material factor to be considered in appraising the property involved herein, it is by no means conclusive, and, in fact, has been held to be of "questionable weight as valuation evidence." Donal A. Carty, 38 T.C. 46, 66 (1962). Apart from the disparity in replacement costs from the original cost, an arbitrary rate of depreciation cannot be applied without a showing that it fairly reflects actual depreciation of the particular property under consideration. Suffice it to say the courts will not be bound by adherence to a rule of reproduction cost less accrued depreciation. Georgia Ry. v. R. R. Comm., 262 U.S. 625, 630 (1923); A. M. Byers Co., 19 B.T.A. 660, 665 (1930); American Steel Wool Mfg. Co., Inc., 14 B.T.A. 762, 765 (1928); Jerecki Manufacturing Co., 12 B.T.A. 1165, 1178 (1928); Donaldson Iron Co., 9 B.T.A. 1081, 1086 (1928); Rockford Malleable Iron Works, 2 B.T.A. 817, 819, 821 (1925); *262 National Packing Corporation, 24 B.T.A. 952 (1931). In National Packing Corporation, supra, where the taxpayer had made an appraisal of its machinery and equipment on reproduction cost less depreciation, we emphasized the inadequacy of this approach as an absolute criterion for the ascertainment of cost basis at page 956: This appraisal, probably made for insurance purposes, purports to be based upon costs of reproduction, new, both for the buildings and for the machinery and equipment, and from these reproduction costs a "depreciated value" was computed. But, neither in the appraisal itself nor in the other evidence in the case, does it appear that the theoretical values set up in the appraisal are the fair market values of the various assets at that time, and therefore the appraisal is not determinative of those values. The appraisal was made at a time when, the evidence shows, there were other idle canneries in the vicinity, and only about a month after the assets appraised had sold at public sale where there was open bidding, at $100,000. The value of the assets when acquired by petitioner is a question of fact and can not be determined by this theoretical *263 computation, even though the computation starts with a reproductive value based upon cost of similar property. Market value is a definite thing and it may have no particular relation to replacement cost, and is in no wise determined by it. See Kinsman Transit Co., 1 B.T.A. 552; Valley Steamship Co., 1 B.T.A. 1107; Rockford Malleable Iron Works, 2 B.T.A. 817; Frost Manufacturing Co., 13 B.T.A. 802. On the whole record petitioner has failed to establish that the values at which the fixed assets were set up on its books were the fair market values thereof at the time it acquired them. * * * Under the circumstances of this case, we cannot accept petitioner's evaluation of the property under review as accurate, Likewise, we cannot accept the appraisal made by the valuation engineer employed by respondent without substantial modification. Expert opinion is, of course, a guide to the court, where it is in accordance with the proven facts of record *264 and where it bears indicia of reliability. Williams v. Commissioner, 256 F. 2d 217, 219 (C.A. 9, 1958), affirming a Memorandum Opinion of this Court. It would unduly and unnecessarily encumber the opinion herein were we to explain in detail our various reasons for giving greater or lesser weight to this or that portion of the testimony of each expert or witness who made an appraisal of the property in question, and we will not attempt to do so fully. Certain matters do, however, deserve specific mention, although we wish to emphasize that they were not our sole criteria. The valuation engineer in the employ of respondent evaluated the machinery and equipment in dispute at $143,654 based upon an inspection of that machinery and a determination of the fair market value which that machinery or machinery of similar type would bring when removed from the factory premises and sold for use in another site and not a part of the sale of a going business for use in the same location. Most of the prices used by the valuation engineer came from dealers engaged in buying and selling used equipment, and said prices conformed substantially to offering of similar machines in established *265 trade journals. Considering the ages of the machines in question, ranging from 1920 to 1937 with respect to the larger machines, their original cost, the fact that some of them were acquired by the predecessor company as used machines, that many of them had been fully depreciated as of December 31, 1940, and were on their second go-round for depreciation purposes, together with the value of similar machines offered for sale or which had been sold, we believe that respondent's approach (while requiring substantial adjustment, infra) is a valuable aid in the determination of the fair market value of the tangible assets referred to in this paragraph. It is our view that the valuation of the tangible assets reached by respondent's witness (taken largely from dealer prices) is somewhat on the low side since it does not include the value of the machinery in the operative condition, that is, installed in petitioner's plant as part of a going business with immediate earning capacity. Undoubtedly petitioner was willing to pay more for the machinery and equipment completely installed in its factory and in an operative condition than said property would have cost "knocked down" in the open *266 market. Accordingly, in order to reflect the increased value of the fixed assets, we have adjusted respondent's valuation by the addition of $35,000, bearing in mind that this necessarily is a matter of judgment. In determining the value of the tangible assets, respondent excluded from his valuation, inter alia, certain permanent wiring and cost of installation, cement foundations, boiler equipment, brick furnaces, main overhead piping and yard tanks referred to herein as "fixtures." Said items were excluded by respondent on the ground that they were permanently attached to and formed part of the realty, title to which did not pass to petitioner in the sale. Respondent further contends that the cost of removing these "fixtures" would exceed their value, which was so-called junk value except for use as part of the going concern in the same location. Respondent determined that the fair market value of the aforesaid items (which he excluded in his valuation of the tangible assets purchased by petitioner) to be in the total amount of $116,313.76. Essentially, it is respondent's position that, since the aforesaid items were especially designed and built into the premises by the predecessor *267 company, which owned the buildings, and the "land, buildings and railroad siding" to which these fixtures were attached, were not part of the sale of assets to petitioner, the fixtures in question formed part of the realty of the vendors, and, hence, said fixtures were depreciable only by the Estate of John J. Regan, which owned them. It is settled law in the State of Pennsylvania that fixtures in a factory may be sold as personal property in pursuance of an agreement between the parties when no rights of others intervene. Piper v. Martin, 8 Pa. 206 (1848). Parties, as between themselves, may in their dealings with chattels annexed or used in connection with realty, fix on them whatever character as realty or personalty on which they may agree and the law will enforce such understanding whenever rights of third parties would not be prejudiced. Brandt v. Koppelman, 82 A. 2d 666-667 (1951) (169 Pa. Superior 236). In support of his view that the fixtures in question were an integral part of the realty, respondent relies on, inter alia, Medical Tower Corporation v. Otis Elevator Co., 104 F. 2d 133-134 *268 (C.A. 3, 1939) 833 (Sup. Ct. Pa. 1948); Messenger Pub. Co. v. Board of Property Assess., Etc., 132 A. 2d 768 (Sup. Ct. Pa. 1957); Pa. Stat. Ann. tit. 72 sec. 5020-201 (Purdon's); Potomac Electric Power Co. v. United States, 85 F. 2d 243, 247 (C.A.D.C. 1936). We have carefully considered these authorities and find them inapposite. Unlike the instant case, in the cases cited by respondent, the intention of the contracting parties regarding the nature of the fixtures involved is not controlling since the rights of third parties would have been prejudiced thereby. In the case at bar, the Agreement of Sale dated January 23, 1956, expressly provided that the "fixtures" (exclusive of the land, buildings and railroad siding) were to be sold to petitioner as part of the over-all transaction. That petitioner did not sustain an actual or separate expenditure for hauling and installation of the property in question is, in our opinion, of no material consequence. Had petitioner purchased the machinery and equipment in question in the open market at a lesser price than he had paid, petitioner would have been entitled to capitalize moving, foundation and installation *269 expenditures over their useful life of 10 years (which corresponds to the lease term). B. Kirk Rankin, 17 B.T.A. 1301, 1308 (1929), affd. on this issue, 60 F. 2d 76 (C.A. 6, 1932), acq. C.B. X-1 (1931), p. 54. Bulletin "F" (revised Jan. 1942) of the Treasury Department states on page 2: The cost of installation, as well as the freight charges thereon, are capital expenditures to be added to the cost of the property recoverable through depreciation deductions. In this connection see also Standard Tube Co., 6 T.C. 950 (1946), where the taxpayer had expended substantial amounts to install machinery in its plant, in which we said (p. 956): that all such expenditures were * * * essentially integral parts of the machines and were so treated and considered. It is logical and proper, therefore, to allow depreciation on the same basis and at the same rate as those applicable to the machines for which the foundations were built and to which the installation costs pertained. * * *
Under the circumstances we believe that respondent erred in his exclusion of the value of the fixtures in dispute which he had computed to have a cost basis of *270 $116,313.76, and his valuation will be adjusted accordingly. Upon such adjustment, in determining the fair market value of the tangibles here involved, we have three items: respondent's determination of $143,654; the value of having the machinery and equipment in an operative condition in the amount of $35,000; and the cost basis of fixtures excluded by respondent from his valuation and restored by us in the amount of $116,313.76, or a total of $294,967.76. Admittedly, we cannot determine an allocation correct to the dollar, and our finding is necessarily based on our best judgment. See United Finance and Thrift Corp. of Tulsa, 31 T.C. 278, 287 (1958), affd. 282 F. 2d 919 (C.A. 4, 1960). (It is apparent, of course, that when we say that respondent understated the value of tangibles, we are, in effect, also saying that respondent overstated good will. The converse, of course, applies to petitioner.) Applying our judgment and after careful consideration of the entire record, we conclude that the fair market value of the tangibles in question at the time of the sale to petitioner was $294,967.76, and correspondingly that the fair market value at the time *271 of intangible assets, including good will, was $177,264.70, both as set forth in our Findings. Manifestly, where both the respondent and petitioner ascribe extreme or unrealistic values to the assets in dispute, the Court is faced with a task in which certainty and precision of its solution are not to be expected. As the Court of Appeals for the Second Circuit stated in Colonial Fabrics v. Commissioner, 202 F. 2d 105, 107 (C.A. 2, 1953), affirming a Memorandum Opinion of this Court: For finding market value is, after all, something for judgment, experience, and reason on the part of the trier, and does not lend itself to dissection and separate evaluation. * * * For completeness, we now discuss the problem in the light of petitioner's contentions. We are convinced that petitioner's cost basis of all of the depreciable assets acquired (i.e., $472,232.46) is quite unrealistic. By the same token, the contention that $1.00 correctly projects the value of good will is equally unrealistic. *272 Ordinarily, if the Court, on the basis of its consideration of all the facts in a particular case concludes that the vendor and vendee, by their agreement in an arm'slength transaction, have made a fair allocation of depreciable and nondepreciable assets, including good will, their agreement will not be disturbed. However, where the valuations are not in accord with the realities of the transaction, we may determine whether the business possessed good will of any fair market value in order to make a proper allocation of the aggregate purchase among the various assets transferred. Copperhead Coal Co., Inc., 272 F. 2d 45 (C.A. 6, 1959), affirming a Memorandum Opinion of this Court. Value of good will must be determined in the light of the facts in each particular case and no rigid rule is applicable to all cases. Schulz Baking Co., 3 B.T.A. 470, 473 (1926). In D. K. MacDonald, 3 T.C. 720, 726 (1944), we quoted the following definition of the term "goodwill" from the Cyclopedic Law Dictionary (1940) as follows: The benefit which arises from the *273 establishment of particular trades or occupations. The advantage or benefit which is acquired by an establishment, beyond the mere value of the capital, stocks, funds, or property employed therein, in consequence of the general public patronage and encouragement which it receives from constant or habitual customers, on account of its local position, or common celebrity, or reputation for skill or affluence or punctuality, or from other accidental circumstances or necessities or even from ancient partialities or prejudices. Story, Partn. § 99. * * * It includes only that estimation and repute which is peculiar to the particular establishment. It is that species of connection in trade which induces customers to deal with a particular firm. Particularly pertinent as a description of good will are the words of Judge Cardozo in In Re Brown, 242 N. Y. 1, 150 N.E. 581 (1926): The books abound in definitions of good will. * * * There is no occasion to repeat them. Men will pay for any privilege that gives a reasonable expectancy of preference in the race of competition. * * * Such expectancy may come from succession in place or name or otherwise to a business that has *274 won the favor of its customers. It is then known as good will. Many are the degrees of value. At one extreme there are expectancies so strong that the advantage derived from economic opportunity may be said to be a certainty; at the other are expectancies so weak that for any rational mind they may be said to be illusory. We must know the facts in any case. * * *
In an early case we pointed out that "one of the chief factors in the development and growth of good will is long continued business under the same or similar names and in the same community." Theo Planz, Inc., 10 B.T.A. 1158-1159 (1928). Other factors to be considered include the record of earnings, stability of customers, the nature of the premises occupied by the business, the operating costs, the economy of the region served and the competition, the competence and efficiency of the management. Estate of Henry A. Maddock, 16 T.C. 324, 329 (1951). In essence, the good will of a business is the potential of that business to realize earnings in excess of the amount which might be considered a *275 normal return from the investment in the tangible assets. Petitioner argues that because its predecessor was a "one man" company and because of the common nature of its business (which produced a highly competitive product), the estate of John J. Regan possessed no transferable good will of a value in excess of the $1.00 paid therefor. Apart from some general testimony of G. O'Dell Fletcher, the bank officer who handled the predecessor company's affairs prior to its sale, there is no convincing evidence that John J. Regan, who died November 20, 1954, was the "spark plug" or dominating force largely responsible for the business success of Philadelphia Steel and Iron Company. Similarly, we find no merit in the testimony with reference to the unusual personal characteristics of Regan which was given by Gerald J. Keady, president of petitioner. Keady admittedly had never met or talked to Regan, the latter having died more than a year before Keady began looking into the purchase of the company. Significantly, the profits of said company did not decline substantially after Regan's demise, although the business was being operated by the principal employees under the supervision of a bank *276 and a widow, neither of whom [appears] to have been expert in the manufacture of pipe flanges. As to the nature of the business purchased, petitioner urges that its principal product, pipe flanges, are not unique in any way; that the business is intensely competitive, and that its success depends upon constant solicitation and servicing since there was no probability that customers would continue their patronage. We of course, have given consideration to these factors, but they are not alone determinative of the ultimate issue. Without enumerating all of the evidence of good will which petitioner acquired with the purchase of the business in question, we advert to the unequivocal fact that the contract of purchase specifically refers to the purchase of "good will;" that the Bill of Sale specifically includes the purchase of "the good will," the name of Philadelphia Steel and Iron Company and the valuable customer list. The record also shows that the business had been operating in the same location, under the same name since 1918 with a competent and stable labor force where most of the laborers had been with the same employer for many years, producing a quality product. We also *277 note an earning record in which net profits averaged approximately 22.3 percent of net sales over a five-year period between 1951 and 1955 and in which the earnings record remained at 21 percent for a year after the death of the owner and while the business was being operated by a bank and the owner's widow. Suffice it to say the fact that petitioner and the seller allocated only $1.00 to good will is not decisive of the issue. In our opinion the purchaser and seller of the business involved herein understood that the total sale price included the physical assets and a substantial "going concern value" of the Philadelphia Steel and Iron Company. Petitioner's own appraisal (prepared by Keystone Appraisal Company) states on its face page that it was a valuation "for use" predicated upon continuation of the business "in the present location assuming competent management and a profitable going concern." If Keady thought the customer lists and the name of petitioner's predecessor were of "little value" we can only say that we disagree. The fact that Keady did not inspect said lists or the books of Philadelphia Steel and Iron Company before petitioner acquired the company does not establish *278 that he negotiated a blind purchase or was without other means of ascertaining the value of intangibles. The fact is, of course, that petitioner purchased a business with a very substantial customer list, which included the names of some of the leading corporations in American industry. Moreover, the record discloses that petitioner was able to retain the business of most of those on the customer list and in some cases to increase sales to them for a year or more. Petitioner, bearing the burden of proof, has presented no satisfactory evidence to explain the cause for the decline in net profits after 1956. But as of January 23, 1956, the critical date involved herein, we have no doubt there was substantial good will and going concern value in this business and that petitioner acquired it. In the light of the foregoing, and having taken into consideration the various factors bearing upon good will, we believe that the record supports a substantial allocation to intangible assets. We hold that as of January 23, 1956, the date petitioner was purchased, the depreciable assets had a fair market value of $294,967.76, and the amount of $177,264.70 was paid for the good will and going concern *279 value. See United Finance and Thrift Corp. of Tulsa and Colonial Fabrics, both supra. Issue II. Sale of Part of the Machinery and Equipment During the fiscal year ending March 31, 1957, petitioner sold certain of the machinery and equipment which it had acquired as of January 1, 1956, and also a Cadillac automobile which had been acquired at a later date. Using the cost basis valuation of $472,232.46 as the cost basis of all of the machinery and equipment in question, petitioner made allocations to the above items sold, and claimed an ordidinary business loss of $7,422.56, with respect to the taxable year ended March 31, 1957. Respondent adjusted this claimed loss, using as the cost basis of the machinery and equipment in question the figure of $143,654. On the basis of cost allocations to the items in question using said $143,654 as the total basis, respondent determined that petitioner had realized a short-term capital gain of $445.85 and a long-term capital gain of $455.91 as a result of the sale of the machinery and equipment in question. Whether petitioner incurred a gain or a loss on the sale of the aforesaid machinery and equipment during 1956 and 1957 will be determined *280 by using $294,967.76 as the cost basis of the entire machinery and equipment here in issue purchased by petitioner as of January 1, 1956. Decision will be entered under Rule 50. Footnotes
*. Date of death of John J. Regan.↩
1. SEC. 167. DEPRECIATION. (a) General Rule. - There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear * * * (1) of property used in the trade or business, or * * *
(g) Basis for Depreciation. - The basis on which exhaustion, wear and tear, and obsolescence are to be allowed in respect of any property shall be the adjusted basis provided in section 1011 for the purpose of determining the gain on the sale or other disposition of such property. * * *↩
2. Section 1011 refers as its basis to section 1012, which provides, in part: SEC. 1012. BASIS OF PROPERTY - COST. The basis of property shall be the cost of such property, * * *.↩