MOSS AMERICAN, INC., Successor By Merger to T.J. Moss Tie Company (Delaware), Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Moss American, Inc. v. Commissioner
Docket No. 6065-71.
United States Tax Court
T.C. Memo 1974-252; 1974 Tax Ct. Memo LEXIS 68; 33 T.C.M. (CCH) 1121; T.C.M. (RIA) 74252; September 23, 1974, Filed. *68 Petitioner's predecessor purchased all the outstanding stock of another corporation for an adjusted cost of $8,767,184.17 and immediately liquidated it under sec. 332, I.R.C. 1954. It allocated its adjusted cost of the stock to the net assets received under the provisions of sec. 334(b) (2), I.R.C. 1954, based on a total fair market value of assets equal to its cost of the stock. The Commissioner reallocated the adjusted cost on the basis of fair market value aggregating $21,270,208.72. Held, the aggregate fair market value of the assets received in liquidation for purposes of applying sec. 334(b) (2) does not exceed the adjusted cost of the stock which petitioner acquired for such purpose. Joseph E. McAndrews, Carol K. Nickel, and Nora A. Bailey, for the petitioner. Thomas J. Miller, for the respondent. GOFFE
MEMORANDUM FINDINGS OF FACT AND OPINION
GOFFE, Judge: Respondent determined a deficiency in the Federal income tax of T.J. Moss Tie Company (Delaware) for its taxable year ended June 30, 1964, in the amount of $1,663,429.25. Petitioner is the surviving corporation of a merger with the taxpayer and is liable for any Federal income tax which may be due from the taxpayer. *69 The issue arises from the purchase by the taxpayer of all the outstanding stock of another corporation and immediate liquidation into the taxpayer-parent.
The issue is whether, in allocating its cost basis in the stock among the assets received in liquidation of its subsidiary under section 334(b) (2)[1] on the basis of the fair market value of such assets, the aggregate of the fair market value of the assets received exceeds the cost of the stock to be allocated. FINDINGS OF FACT Some of the facts were stipulated. The stipulation of facts and exhibits are incorporated by reference. T.J. Moss Tie Company (Delaware) filed its Federal income tax return and its amended Federal income tax return for the taxable year ended June 30, 1964, with the district director of internal revenue at St. Louis, Missouri. It was subsequently merged into petitioner and petitioner is liable for any Federal income tax which may be due from T.J. Moss Tie Company (Delaware). The principal office of petitioner when it filed its petition was located in Oklahoma City, Oklahoma. For convenience, T.J. Moss *70 Tie Company (Delaware) will hereafter be referred to as petitioner. T.J. Moss Tie Company (Missouri), hereafter referred to as Moss Tie, was incorporated under the laws of Missouri on September 12, 1893, and from its incorporation it was primarily engaged in producing railroad ties and it also engaged in preserving timber for other uses. Moss Tie operated wood preserving plants in East St. Louis, Illinois; Granville, Wisconsin; Bossier City, Louisiana; and Columbus, Mississippi. It operated three dealer service wholesale lumber yards which sold lumber, roofing and hardware. In addition, it owned ten other yard sites and leased approximately 50 sites from railroads for use as concentration points. It owned 21 saw mills and owned interests in 11 other saw mills. All of the saw mills were leased to independent operators. Moss Tie also owned 231,168.73 acres of timberland located in 11 states. In the early 1950's, the shareholders of Moss Tie began to consider selling their stock. The stock was not traded on an exchange and 80 percent of the shareholders did not actively participate in the operations of the corporation. They desired investments that were more marketable and were *71 apprehensive about the future success of the railroad tie business.Unsuccessful attempts were made to sell the stock to Allied Chemical and U.S. Steel. Moss Tie owned 133,527.38 acres of land in southeast Missouri and prior to 1960 it employed a geophysicist to determine the potential for mineral production from such land. He concluded that the potential was speculative and Moss Tie abandoned any hopes of mineral exploration because of the high costs involved. In 1960, Kerr-McGee Corp. began exploration activities for lead and zinc deposits in southeast Missouri. Kerr-McGee's business included exploration for oil, gas and uranium and refining and marketing petroleum products. Between 1961 and 1963, Kerr-McGee acquired exploration permits for 20,000 to 30,000 acres of Federal lands in southeast Missouri and in May 1961 sought to obtain an option for 30,000 acres of land owned by Moss Tie in that area. In 1961, the president of J.M. Huber Co. offered, on behalf of the corporation, to enter into a joint venture with Moss Tie for mineral exploration of Moss Tie's land in southeastern Missouri. Moss Tie declined that offer. In 1962, Moss Tie learned that Huber was acquiring timberland *72 in Tennessee near like property owned by Moss Tie.Moss Tie satisfied itself as to Huber's financial soundness and advised Huber that it was willing to sell its assets. After some discussions, Huber, on August 22, 1962, offered to purchase all the assets of Moss Tie for $5,676,000. Moss Tie rejected the offer but its shareholders made a counteroffer to sell all of their stock of Moss Tie for $8,800,000 plus a retained interest in the minerals underlying the timberlands. The counteroffer also provided an alternative whereby Huber would pay $3,200,000 for the stock and vote to liquidate; the liquidation would be handled by Moss Tie; and the Moss Tie shareholders would receive the proceeds from the sale of the operating assets which had a book value of $5,600,000 as of October 31, 1961. Huber rejected the counteroffer and on October 23, 1962, offered to purchase the timberlands, including the mineral rights, for $2,300,000. Moss Tie rejected this offer because the shareholders desired to dispose of the entire corporation. The shareholders and directors of Moss Tie considered liquidation with operating assets going to one group of shareholders and timberlands to another group but no *73 agreement could be reached. In 1962, Kerr-McGee began negotiations to acquire Moss Tie. The shareholders of Moss Tie, on January 3, 1963, agreed to sell their shares to Kerr-McGee for $10,750,000 or to exchange such shares for 200,000 shares of Kerr-McGee common stock. As negotiations progressed, Kerr-McGee's geologist concluded from his survey of Moss Tie properties in southeast Missouri that the possibility of mineral extraction looked promising.Kerr-McGee officials inspected some of the operating assets of Moss Tie and financial data of Moss Tie was furnished to accountants for Kerr-McGee. Kerr-McGee employed an independent appraiser to render an opinion as to the value of the timberlands. He completed his report in March 1963 with an opinion of $5,685,567.04 for the value of the timberlands. On March 29, 1963, Kerr-McGee rejected the offer of the shareholders of Moss Tie and offered to purchase their stock for $8,000,000. In April 1963, the Moss Tie shareholders unsuccessfully attempted to raise the price to $9,000.000. On April 19, 1963, Kerr-McGee formally offered to purchase all the outstanding shares of Moss Tie for $8,000,000 and the shareholders accepted the offer. *74 The purchase was effected on July 1, 1963, by a wholly-owned subsidiary of Kerr-McGee, Kermac Tie Co., Inc., whose funds for the purchase came from Kerr-McGee. On the same date, Moss Tie was merged into Kermac Tie with the intent that the merger would effect a liquidation of a wholly-owned subsidiary within the meaning of section 332 of the Internal Revenue Code. The name of the surviving corporation, Kermac Tie, was changed to T.J. Moss Tie Company (Delaware) which has been referred to herein as petitioner. Petitioner, pursuant to the terms of the merger and liquidation, assumed all of the outstanding liabilities of Moss Tie, aggregating $767,184.17. After the acquisition, merger and liquidation, petitioner continued to operate the business as it had operated prior to such transactions but in addition Kerr-McGee actively explored the Missouri timberlands previously owned by Moss Tie for mineral deposits. It drilled 23 core holes but found no deposits of commercial quantity and discontinued such operations in 1969. Kerr-McGee hopes to explore further in the future. Kerr-McGee did not explore for minerals on any of the other properties formerly owned by Moss Tie. Petitioner *75 continues to own most of the timberlands formerly owned by Moss Tie. On its income tax return for the taxable year ended June 30, 1964, petitioner allocated its adjusted cost of the stock of Moss Tie ($8,767,184.17) among the assets it received upon the liquidation of Moss Tie on the basis of a total fair market value of $8,767,184.17 under the provisions of section 334(b) (2) of the Internal Revenue Code . In his statutory notice of deficiency, the Commissioner valued the assets of Moss Tie at $21,270,208.72 and allocated the adjusted cost of the stock ($8,767,184.17) differently than did petitioner. The following schedule depicts the assets received by petitioner from liquidation of Moss Tie, their book values, the valuation and allocated cost bases reported by petitioner on its income tax return and the valuation and allocated cost bases determined by the Commissioner in his statutory notice of deficiency. Assets
Moss Tie Book Value
Valuation & Allocation per Return
Commissioner's Valuation
Commissioner's Allocation Cash
$ 504,522.14
$ 504,522.14
$ 504,522.14
$ 504,522.14
U.S. Treasury Bills
570,715.83
570,715.83
570,715.83
570,715.83
Cash Value - Life Insurance
385,608.55
385,608.55
385,608.55
385,608.55
Notes Receivable
30,987.46
30,987.46
30,987.46
11,690.14
Accounts Receivable
1,198,346.07
1,198,346.07
1,198,346.07
441,302.79
Prepaid Expenses
74,779,14
74,779.14
74,779.14
27,764.08
Prepaid Operating Expenses
12,776.34
12,776.34
12,776.34
4,383.80
Inventory
2,700,707.67
3,825,086.85
3,825,086.85
1,410,123.17
Timber on Time Lands
52,040.58
52,040.58
52,040.58
18,996.48
Investments
71,855.69
182,106.50
182,106.50
67,218.31
Land - Plant sites
122,687.30
122,687.30
564,859.00
208,961.26
Yard & Mill sites
76,480.00
76,480.00
204,197.00
75,985.91
Timberlands
126,630.79
126,630.79
3,180,709.90
1,173,397.83
Timber [1]
-
-
4,388,627.36
1,619,084.42
Plants & Equipment
559,507.03
1,181,424.42
4,296,715.00
1,584,744.64
Yard Equipment
88,904.86
148,037.51
1,294,042.00
477,103.85
Production Equipment
162,470.96
259,772.87
417,909.00
154,163.72
Office Equipment 5,744.90
15,181.82
86,000.00
31,417.25
Total $6,744,765.30
$8,767,184.17
[2] $21,270,208.72
$8,767,184.17
*76 The valuations used by the Commissioner in his statutory notice of deficiency exceeded the adjusted cost basis of the stock by $12,503,024.55 and were based upon the valuation report which Kerr-McGee had obtained with certain adjustments and valuations by the Commissioner's valuation engineer. The reallocation of the adjusted cost basis of the stock by the Commissioner in his statutory notice of deficiency produced most of the deficiency in income tax he determined by reason of sales of inventories, timber and equipment and collection of accounts receivable. ULTIMATE FINDINGS OF FACT The price which Kerr-McGee paid for the stock of Moss Tie represented the fair market value of the net assets of Moss Tie. OPINION The issue in this case concerns determination of the basis of assets received in corporate liquidation as part of an acquisition described in section 334(b) (2) (B). [2] *78 That section was a codification of the holding of this Court in Kimbell-Diamond Milling Co., 14 T.C. 74 (1950), affirmed per curiam 187 F.2d 718 *77 (C.A. 5, 1951), certiorari denied 342 U.S. 827 (1951). Compare Yoc Heating Corp., 61 T.C. 168 (1973). In general terms, the adjusted cost of stock acquired for purposes of obtaining the assets of a corporation is allocated among the assets of the corporation acquired and liquidated in relation to the relative fair market values of such assets. Petitioner contends that in allocating the cost of the stock to the assets, the aggregate of the fair market values of the assets should not exceed *79 the adjusted cost of the stock. Respondent disagrees, contending that the fair market value exceeds the cost of the stock. In his statutory notice of deficiency, he applied an aggregate fair market value which exceeded the adjusted cost of the stock by $12,503,024.55. The allocation urged by respondent results in lower allocations of basis to inventory, timber and timberlands, accounts receivable and prepaid expenses thereby generating income in addition to that reported on the return as a result of subsequent business operations and collections of accounts receivable. It is undisputed that petitioner is entitled to allocate its adjusted cost of the stock ($8,000,000 cost of stock plus $767,184.17 of liabilities assumed) among the assets it received upon the liquidation of Moss Tie. Sec. 334(b) (2), Internal Revenue Code. Petitioner contends that the total fair market value to be allocated among the assets should not exceed the amount that petitioner paid for the stock because the sale of the stock is the best evidence of the aggregate fair market value of the assets involved herein. On the facts before us, we agree with petitioner. It is doubtful that respondent would dispute *80 the proposition that the price paid for the stock ($8,000,000) plus the liabilities assumed ($767,184.17) is the best evidence of the fair market value of the stock on the date petitioner purchased the stock. It must be so, because it fits within the well-accepted definition of fair market value; i.e., the price at which property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell, and both having reasonable knowledge of the relevant facts. Petitioner liquidated Moss Tie on the date the sale was consummated. Whether such selling price represents the fair market value of the underlying assets of the corporation is the point of disagreement between the parties. The regulations provide that the adjusted cost basis in the stock shall be allocated among the assets on the basis of the net fair market values of the assets. Sec. 1.334-1(c) (4) (viii). The regulations do not, however, indicate how the fair market value will be determined but presumably the usual, above-described, well-accepted definition applies. The record herein shows clearly that the price ultimately paid by Kerr-McGee was the result of hard bargaining *81 on an arm's-length basis, and we conclude that such price represented what the parties considered to be the value of the underlying assets. Respondent relies upon Boise Cascade Corp. v. United States, 288 F. Supp. 770 (D. Idaho 1968), affirmed per curiam 429 F.2d 426 (C.A. 9, 1970). That case does not support the proposition urged upon us by respondent. It is correct that the adjusted cost for the stock was $6,793,655.82 and the opinion recites the fact that the assets of the corporation being liquidated had a fair market value of $9,488,342.43; but, there is no indication that the total fair market value of the assets was in dispute. The issue in that case was what constituted "cash and its equivalent." The taxpayer argued that marketable securities, inventories, accounts receivable and prepaid supplies were equilvalent to cash because the taxpayer intended to pay the full cash value for such items when it purchased the stock. The Court held that the subjective test of Kimbell-Diamond, 14 T.C. 74 (1950), was eliminated when Congress enacted section 334(b) (2) and the Court was unwilling to apply a new subjective test as to which assets were to be reduced to cash. Compare Yoc Heating Corp., 61 T.C. 168, 178 (1973). *82 We agree with the result in Boise Cascade, supra, as it applies to the question of what constitutes "cash and its equivalent." See Victor Meat Co., 52 T.C. 929, 932 (1969). Whether an item represents "cash and its equivalent" is a question of fact as to that item. Madison Square Garden Corp., 58 T.C. 619, 628 (1972), reversed on another issue, [*] F.2d [*] (C.A. 2, 1974). We disagree, however, with the statement of the District Court in Boise Cascade, supra, that "Taxpayer in essence seeks to transform a stock acquisition into an assets acquisition." 288 F. Supp. at 774. Such statement does not agree with our interpretations of section 334(b) (2) which is that an acquisition of stock which falls within the ambit of that section should be trated as an acquisition of the underlying assets. In Argus, Inc., 45 T.C. 63 (1965), we decided that when a subsidiary is liquidated into its parent under the provisions of section 334(b) (2), the balance in the reserve for bad debts of the subsidiary constitutes income to the subsidiary in its final taxable year. Petitioner contended that the reserve was carried over to the surviving corporation because the subsidiary was merged into the parent *83 pursuant to state law. Petitioner had allocated its cost of the stock in the subsidiary among the assets received upon liquidation pursuant to section 334(b) (2). We stated at page 69 of 45 T.C.: a For income tax purposes the basis of assets acquired in a transaction that falls under section 334(b) (2) is determined as if the assets had been purchased by the acquiring corporation for the price paid for the stock which it acquired in order to acquire the assets. In our opinion consistency demands that for related purposes the transaction should also be treated as the purchase by one corporation of all of the assets of another corporation. * * * We had previously held that where a corporation sold its accounts receivable, the need for its reserve for bad debts ceased to exist, resulting in realization of income. In Cabax Mills, 59 T.C. 401 (1972), petitioner acquired 98 percent of the stock of another corporation which held timber-cutting contracts. It liquidated the corporation and allocated its cost of the stock among the assets pursuant to section 334(b) (2). The allocation of the purchase price was not in dispute. Rather the issue related to the holding period of assets received *84 in a section 334(b) (2) liquidation. We approved "tacking on" the holding period of the stock onto the holding period of the timber-cutting contracts for purposes of the six-month holding period requirement of section 631(a).Respondent contended that the holding period began when the subsidiary was liquidated and petitioner contended it began when it acquired the stock in the subsidiary. Respondent argued that section 334(b) (2) does not recognize that a nontaxable exchange takes place for purposes of section 1223(1) when the subsidiary is liquidated. In the course of our opinion, we stated at 59 T.C. 408 to 411: The purpose of enacting section 334(b) (2) was to provide a mechanical test for determining whether the Kimbell-Diamond doctrine is applicable in determining the basis of assets acquired by the circuitous route of acquiring the stock of the corporation which owned those assets and then liquidating that corporation. Under section 334(b) (2) any corporation a fulfilling the conditions set out in it must take a substituted basis in the distributed assets of the liquidated subsidiary equal to the parent corporation's basis in the subsidiary's stock. The rationale of the provision *85 assumes the stock of the liquidating corporation is priced to reflect the current value of its assets; and, thus, the distributee corporation takes a basis in all of the assets received in liquidation equal to their fair market value instead of a carryover basis in the assets derived from the liquidating corporation's basis in them as required in section 334(b) (1). See H. Rept. No. 1337, supra at p. A100. Consequently, section 334(b) (2) has the effect of a double-edged sword; it requires the acquiring corporation to take a substituted basis in the distributed assets regardless of whether the corporation's basis in the subsidiary's stock is more or less than the subsidiary's basis in those assets. We find nothing inconsistent with the purpose of section 334(b) (2) and the rationale of Kimbell-Diamond to permit the acquiring corporation to add to its holding period for the assets so acquired the time that it held the subsidiary's stock. In fact, it seems more consistent with the underlying theory of the statute, that the purchase of the stock was in fact the purchase of the assets, to do so. Also, applying the clear meaning of the statutory language leads to that result.[Emphasis *86 added.] * * * Extending this to the final step, it follows that the purchase of the stock actually is the purchase of the assets, n6 the holding period attaching at that time, and the liquidation no more than a formalistic measure employed to reduce the then-owned assets to petitioner's possession. [Footnote omitted.] * * * Finally, not only do we believe that our decision obtains the proper legal result in holding that petitioner may avail itself of section 1223(1), but it also comports with the equitable motives of Congress manifested in its enactment of section 334(b) (2). For we hold that an acquiring corporation, Cabax in this case, is treated as if it had been able to purchase the naked assets of its subsidiary as of the date it was forced to buy most of the subsidiary's stock to obtain the assets in an indirect manner. Such treatment is afforded by the basis provisions of section 334(b) (2), and our decision here is simply a logical extension of that purpose. Here, petitioner has not gained any unwarranted tax benefits for it is clear that Cabax may tack only its own holding periods, that of the Snellstrom stock to the assets received in liquidation, and, therefore, it *87 receives no unwarranted benefit from Snellstrom's prior ownership of the timber contracts. n7 [Footnote omitted.] Since we have concluded that the fair market value of the underlying assets herein was equal to the amount paid by Kerr-McGee for the stock [3] (adjusted, of course, for liabilities assumed) it is that amount which is to be used in allocating the cost under the foregoing rationale. Respondent also relies upon Ralph R. Garrow, 43 T.C. 890 (1965), affirmed per curiam 368 F.2d 809 (C.A. 9, 1966). That case involved allocation of basis to assets received in liquidation under section 334(c) under circumstances where nothing was paid for such assets. It, therefore, has no bearing on the issue presented herein. As we have already pointed out, the adjusted cost of the stock ($8,767,184.17) was negotiated between the parties dealing at arm's-length after unsuccessful attempts by Moss Tie and its shareholders to sell *88 stock, assets or to liquidate, while the fair market value of the assets determined by respondent ($21,270,208.72) is a theoretical figure based upon the opinion of an independent appraiser modified by those of a valuation engineer. As we do not accept such valuations, no useful purpose would be served by commenting upon our doubts as to the weight to be accorded such opinions or admissibility as evidence. We do not consider such countervailing evidence sufficient to have us treat the purchase of the stock of Moss Tie as a bargain purchase, which respondent would have us do. If such a purchase had, in fact, occurred, we would, of course, be faced with a different question and respondent's position would have merit. There is no question in this case that petitioner acquired the Moss Tie stock in order to liquidate the corporation as it was liquidated on the date the sale was consummated and the record as a whole undeniably supports such a conclusion. Accordingly, we are not faced with a factual situation or legal issues such as were involved in E. T. Griswold, 45 T.C. 463 (1966), affd. 400 F.2d 427 (C.A. 5, 1968), or Kansas Sand and Concrete, Inc., 56 T.C. 522 (1971), affd. 462 F.2d 805 *89 (C.A. 10, 1972). Having concluded that $8,767,184.17 represented the fair market value of the underlying assets, we must, nevertheless, proceed to allocate that amount in accordance with the regulations under section 334(b) (2). Here we are faced with a narrow issue because respondent does not dispute petitioner's component fair market values except to the extent that they are involved in his recomputation of the aggregate fair market value. Instead, respondent argues percentages and his difficulty in allocating costs to units of timberland for depletion purposes. The latter would not appear to be an insurmountable mechanical obstacle. The allocations made by petitioner are, therefore, approved. The Commissioner, in his statutory notice of deficiency, determined that certain prepaid operating expenses and prepaid expenses, including prepaid insurance, did not represent "cash and its equivalent" within the meaning of section 1.334-1(c) (4) (v) (b ) (1 ), Income Tax Regs. He, nevertheless, determined the value of such items in amounts identical to the valuations used by petitioner on its income tax return. He determined an allocated basis for such items differently than petitioner *90 because he used the $21,270,208.72 aggregate fair market value of the assets rather than $8,767,184.17. Having decided that the foundation of the Commissioner's allocation was improper, the question of "cash and its equivalent" for such items becomes moot and the allocations of the petitioner are approved. Petitioner conceded the correctness of the Commissioner's adjustments wherein he disallowed capital gains treatment under section 631(a) as to $79,178 in timber sales; disallowed a deduction for attorneys' fees in the amount of $1,132.06; determined the useful life of buildings to be 15 years with no salvage value in lieu of a 10-year useful life with a 10 percent salvage value. In order to reflect the concessions of petitioner, Decision will be entered under Rule 155. Footnotes
1. All references to the Internal Revenue Code of 1954 in effect for the taxable period involved here. ↩
1. The book value of the timberland and timber was combined. ↩
2. The total is the amount used in the statutory notice of deficiency. The correct total is $21,270,028.72. ↩
2. SEC. 334. BASIS OF PROPERTY RECEIVED IN LIQUIDATIONS. (b) LIQUIDATION OF SUBSIDIARY. - * * * (2) EXCEPTION. - If property is received by a corporation in a distribution in complete liquidation of another corporation (within the meaning of section 332(b)), and if - (A) the distribution is pursuant to a plan of liquidation adopted - (i) on or after June 22, 1954, and (ii) not more than 2 years after the date of the transaction described in subparagraph (B) (or, in the case of a series of transactions, the date of the last such transaction); and (B) stock of the distributing corporation possessing at least 80 percent of the total combining voting power of all classes of stock entitled to vote, and at least 80 percent of the total number of shares of all other classes of stock (except nonvoting stock which is limited and preferred as to dividends), was acquired by the distributee by purchase (as defined in paragraph (3)) during a 12-month period beginning with the earlier of, (i) the date of the first acquisition by purchase of such stock, or (ii) if any of such stock was acquired in an acquisition which is a purchase within the meaning of the second sentence of paragraph (3), the date on which the distributee is first considered under section 318(a) as owning stock owned by the corporation from which such acquisition was made, then the basis of the property in the hands of the distributee shall be the adjusted basis of the stock with respect to which the distribution was made. For purposes of the preceding sentence, under regulations prescribed by the Secretary or his delegate, proper adjustments in the adjusted basis of any stock shall be made for any distribution made to the distributee with respect to such stock before the adoption of the plan of liquidation, for any money received, for any liabilities assumed or subject to which the property was received, and for other items. ↩
3. It should be remembered that in this case the purchase of stock and the liquidation occurred virtually simultaneously. We do not herein decide the question of fair market value where there is a significant interim period between the purchase and the liquidation. ↩